# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| FRIENDS OF DANNY DEVITO, KATHY GREGORY, B&J LAUNDRY, LLC, BLUEBERRY HILL PUBLIC GOLF COURSE & LOUNGE, AND CALEDONIA LAND COMPANY, | : No. 68 MM 2020<br>:<br>:<br>:<br>:<br>: |
| Petitioners | : |
| | : |
| v. | : |
| | : |
| TOM WOLF, GOVERNOR, AND RACHEL LEVINE, SECRETARY OF PA DEPARTMENT OF HEALTH, | :<br>:<br>: |
| Respondents | : |

## OPINION

**JUSTICE DONOHUE**                                  **Decided: April 13, 2020**

Petitioners are four Pennsylvania businesses and one individual seeking extraordinary relief from Governor Wolf's March 19, 2020 order (the "Executive Order") compelling the closure of the physical operations of all non-life-sustaining business to reduce the spread of the novel coronavirus disease ("COVID-19"). The businesses of the Petitioners were classified as non-life-sustaining.[1] In an Emergency Application for

---

[1] Respondents contend that any claims of Petitioners B&J Laundry and Caledonia Land Company are moot, as their businesses have been removed from the non-life-sustaining category. Respondents' Brief at 6 n.13. Petitioners respond that these claims are not moot, as this Court may consider moot issues of great importance when they are capable

Extraordinary Relief (the "Emergency Application") filed on March 24, 2020, Petitioners raise a series of statutory and constitutional challenges to the Executive Order, contending that the Governor lacked any statutory authority to issue it and that, even if he did have such statutory authority, it violates various of their constitutional rights. Petitioners assert that the exercise of this Court's King's Bench jurisdiction is not only warranted but essential given the unprecedented scope and consequence of the Executive Order on businesses in the Commonwealth. Petitioners' Brief at 12-13. They request further that this Court issue an order vacating or striking down the Executive Order. Respondents, Governor Tom Wolf ("Governor") and Rachel Levine, the Secretary of the Pennsylvania Department of Health ("Secretary") (collectively, "Respondents") respond that the Petitioners rely on an unduly narrow interpretation of the Commonwealth's inherent police powers and a flawed reading of the specific statutory provisions that the General Assembly enacted to supplement that power. Respondents' Brief at 2. Respondents further argue that the Executive Order comports with all constitutional requirements. Respondents agree with Petitioners that the circumstances warrant the exercise of this Court's King's Bench jurisdiction and urge this Court to exercise that jurisdiction to decide the issues presented. Respondents' Brief at 7.

---

of repetition yet evade review. Petitioners' Brief at 48 n.17 (citing, *e.g., Association of Pennsylvania State College and University Faculties v. PLBR*, 8 A.3d 300, 305 (Pa. 2010)). Excluding B&J Laundry and Caledonia Land Company, the claims of the remaining Petitioners adequately present the issues of public importance for which we grant King's Bench review. The claims of Petitioners B&J Laundry and Caledonia Land Company are thus considered moot and "Petitioners" will henceforth refer to DeVito Committee, Kathy Gregory and Blueberry Hill Public Golf Course & Lounge.

For the reasons discussed in this opinion, we hereby exercise our King's Bench jurisdiction. After consideration of the arguments of the parties, we conclude that Petitioners are not entitled to relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. COVID-19, and the Executive Proclamation and the Order of the Governor

A novel coronavirus began infecting humans in China in December 2019. As of March 11, 2020, the World Health Organization ("WHO") announced that the coronavirus, which had spread into at least 144 countries including the United States, had infected at least 118,000 people, and had killed more than 4,000 people, was officially a pandemic. WHO Director-General, "WHO Director-General's opening remarks at the media briefing on COVID-19," World Health Organization, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. In the midst of the emerging crisis, on March 6, 2020, Governor Wolf issued the following proclamation:

**PROCLAMATION OF DISASTER EMERGENCY**

**WHEREAS**, a novel coronavirus (now known as "COVID-19") emerged in Wuhan, China, began infecting humans in December 2019, and has since spread to 89 countries, including the United States; and

**WHEREAS**, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared COVID-19 a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and WHEREAS, the Commonwealth of Pennsylvania ("Commonwealth") has been working in collaboration with the CDC, HHS, and local health agencies since December 2019 to monitor and plan for the containment and subsequent mitigation of COVID-19; and

**WHEREAS**, on February 1, 2020, the Commonwealth's Department of Health activated its Department Operations Center at the Pennsylvania Emergency Management Agency's headquarters to conduct public health

and medical coordination for COVID-19 throughout the Commonwealth; and

**WHEREAS**, on March 4, 2020, the Director of the Pennsylvania Emergency Management Agency ordered the activation of its Commonwealth Response Coordination Center in support of the Department of Health's Department Operations Center, to maintain situational awareness and coordinate the response to any potential COVID-19 impacts across the Commonwealth; and

**WHEREAS**, as of March 6, 2020, there are 233 confirmed and/or presumed positive cases of COVID-19 in the United States, including 2 presumed positive cases in the Commonwealth; and

**WHEREAS**, while it is anticipated that a high percentage of those affected by COVID- 19 will experience mild influenza-like symptoms, COVID-19 is a disease capable of causing severe symptoms or loss of life, particularly to older populations and those individuals with pre- existing conditions; and

**WHEREAS**, it is critical to prepare for and respond to suspected or confirmed cases in the Commonwealth and to implement measures to mitigate the spread of COVID-19; and

**WHEREAS**, with 2 presumed positive cases in the Commonwealth as of March 6, 2020, the possible increased threat from COVID-19 constitutes a threat of imminent disaster to the health of the citizens of the Commonwealth; and

**WHEREAS**, this threat of imminent disaster and emergency has already caused schools to close, and will likely prompt additional local measures, including affected county and municipal governments to declare local disaster emergencies because of COVID-19; and

**WHEREAS,** this threat of imminent disaster and emergency situation throughout the Commonwealth is of such magnitude and severity as to render essential the Commonwealth's supplementation of emergency resources and mutual aid to the county and municipal governments of this Commonwealth and to require the activation of all applicable state, county, and municipal emergency response plans.

**NOW THEREFORE**, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7101, et seq., I do hereby proclaim the existence of a disaster emergency throughout the Commonwealth.

Governor Wolf, "Proclamation of Disaster Emergency," (Mar. 6, 2020), Commonwealth of Pennsylvania Office of the Governor, https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf ("Governor's Proclamation").

Thereafter, on March 19, 2020, Governor Wolf issued the following Executive Order, closing all businesses deemed to be non-life-sustaining:

**ORDER OF
THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA
REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT
LIFE SUSTAINING**

**WHEREAS**, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and

**WHEREAS**, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and

**WHEREAS**, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and

**WHEREAS**, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and

**WHEREAS**, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and

**WHEREAS**, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means

for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and

**WHEREAS**, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.

**NOW THEREFORE**, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:

Section 1: Prohibition on Operation of Businesses that are not Life Sustaining

> All prior orders and guidance regarding business closures are hereby superseded.

> No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.

> Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.

> A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.

> Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.

Section 2: Prohibition on Dine-In Facilities including Restaurants and Bars

> All restaurants and bars previously have been ordered to close their dine in facilities to help stop the spread of COVID-19.

> Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons.

> Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.[2]

> Section 3: Effective Date and Duration

> This order is effective immediately and will remain in effect until further notice.

Governor Wolf, "Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses that are not Life Sustaining," (Mar. 19, 2020) https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf ("Executive Order"). The original five page attached list of businesses deemed to be life-sustaining, or not, which as noted herein has been amended from time to time, may be found at https://www.governor.pa.gov/wpcontent/uploads/2020/03/20200319-Life-Sustaining-Business.pdf.

In compiling the list, the Governor used the North American Industry Classification System ("NAICS"), a code developed by the Office of Management and Budget and utilized by the U.S. Census Bureau to group similarly situated entities together for classification purposes, to serve as the basis for an initial list of business sectors. Respondents' Brief at 47 (citing U.S. Census Bureau, North American Industry Classification System, https://www.census.gov/eos/www/naics/ (last visited 4/8/2020)). The Governor explains that he used this classification system to "ensure[] that similarly situated entities would be treated the same." *Id.* The Governor and Department of

---

[2] The Governor later revised the enforcement date to Monday, March 23, at 8 a.m. *See* "Waiver Extension, Revised Timing Of Enforcement: Monday, March 23 at 8:00 AM", available at https://www.governor.pa.gov/newsroom/waiver-extension-revised-timing-ofenforcement-monday-march-23-at-800-am/.

Community and Economic Development ("DCED") then generally conformed its categorizations of certain sectors, and businesses therein, as life-sustaining versus non-life-sustaining business to make them consistent with an advisory issued by the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA"). Gov. Tom Wolf, "Life Sustaining Business Frequently Asked Questions", DCED.PA.GOV, https://www.scribd.com/document/452553495/UPDATED-4-00pm-April-1-2020-Life-Sustaining-Business-FAQs (last visited Apr. 8, 2020) (citing CISA Advisory Version 1.1, as amended March 23, 2020). According to CISA, "[t]here are 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof." CISA, "Identifying Critical Infrastructure During COVID-19," https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19 (last visited Apr. 8, 2020). The Advisory includes within each of the sectors, operations that provide essential services to the identified sectors.

By its terms, the Executive Order compels the closure of all businesses in the state deemed to be non-life-sustaining to prevent the spread of COVID-19 by limiting person-to-person interactions through social distancing.[3] In issuing the Executive Order, the

---

[3] "Social distancing is a public health practice that aims to prevent sick people from coming in contact with healthy people in order to reduce opportunities for disease transmission." OU Medicine, "Social Distancing and Stopping the Spread," https://www.oumedicine.com/coronavirus/protecting-your-health/social-distancing (last visited 4/9/2020). Social distancing is essential to limiting the death toll from COVID-19 because this pandemic spreads primarily through person to person contact, as many as 25% of those infected are asymptomatic, and the virus has an incubation period of up to fourteen days. The virus can remain on surfaces for days and can spread through the air within confined areas and structures. Respondents' Brief at 3-4 (citations omitted).

Governor invoked three statutory grounds for his and his administration's authority to do so: the Emergency Management Services Code (the "Emergency Code"), 35 Pa.C.S. § 7101-79a31; sections 532(a) and 1404(a) of the Administrative Code, 71 P.S. § 532; 71 P.S. § 1403(a); and the Disease Prevention and Control Law (the "Disease Act"), 35 P.S. § 521.1-521.25. The Governor, with the assistance of the DCED, determined which types of Pennsylvania businesses are "life-sustaining" and which are "non-life-sustaining." Those in the latter category were forced to shutter their physical operations[4] under threat of criminal prosecution. A waiver process has been established for businesses to request relief.[5] A successful request for waiver results in a business being re-categorized as life-sustaining or offering support to life-sustaining businesses.[6]

B. **The Parties**

Petitioner Friends of Danny DeVito ("DeVito Committee") is a Pennsylvania candidate committee with a physical business address in Carnegie (Allegheny County). It was formed to operate and administer the candidacy of Danny DeVito, a candidate for the 45th District of the Pennsylvania State House of Representatives. Emergency Application, ¶ 61. DeVito Committee complains that the district offices of the opponent for the 45th District seat in the upcoming election, the incumbent Representative Anita

---

[4] The Executive Order does not preclude non-life-sustaining businesses from virtual operations, e.g., online internet activities or work-from-home arrangements.

[5] Richard E. Coe, "Pennsylvania Grants Waivers Allowing Non-'Life-Sustaining' Businesses to Resume Operations," (Apr. 1, 2020), https://www.natlawreview.com/article/pennsylvania-grants-waivers-allowing-non-life-sustaining-businesses-to-resume.

[6] Gov. Tom Wolf, "Life Sustaining Business Frequently Asked Questions", DCED.PA.GOV, https://www.scribd.com/document/452553495/UPDATED-4-00pm-April-1-2020-Life-Sustaining-Business-FAQs (last visited Apr. 8, 2020).

Kulik, are not subject to the Executive Order and, therefore, she retains access to her office, staff and office equipment. *Id.*, ¶ 62. DeVito Committee, however, does not have access to its office and, therefore, cannot conduct DeVito's campaign. *Id.*, ¶ 63. It argues that this "dissimilar and unequal treatment" of candidates infringes on candidate DeVito's right to equal protection. *Id.*, ¶ 62. If permitted to reopen the campaign office, it asserts that it "will incorporate COVID-19 prevention protocol" similar to those employed by agencies under the Governor's jurisdiction. *Id.*, ¶ 64.

Petitioner Kathy Gregory ("Gregory") is a licensed real estate agent with a physical business address in Bethlehem (Northampton County). *Id.*, ¶ 65. Gregory is licensed through Better Homes and Gardens R.E., a real estate brokerage franchise. *Id.*, ¶ 66. Pursuant to Pennsylvania law, she can only buy and sell real estate through her broker/franchisor. Her broker/franchisor has, however, closed the office and will not apply for a waiver, and thus she cannot apply for a waiver. *Id.*, ¶ 68-69. Gregory complains that, because the Executive Order put "Office of Real Estate Agents and Activities Related to Real Estate Agents" on the non-life-sustaining list, she cannot work at her office or from her home. *Id.*, ¶ 67. In contrast, she contends, many other professionals are permitted to work from virtual offices, and insurance agents and brokers, who are on the life-sustaining list, are permitted to continue their physical business operations. *Id.* She explains that many of her clients have sold their homes and need to depart by the end of June; thus, she needs to be able to find them replacement homes, which requires her to show clients potential properties. *Id.*, ¶ 71. If permitted to resume working, Gregory avers that she will implement the COVID-19 prevention and mitigation protocols put in place by the National Association of Realtors. *Id.*, ¶ 74.

Petitioner Blueberry Hill Public Golf Court & Lounge ("Blueberry Hill") operates a public golf course and restaurant (now take-out only) in Russell (Warren County). *Id.*, ¶ 83; Petitioners' Brief at 49. It avers that the Executive Order has resulted in financial harm to its business. Specifically, despite being closed for business, Blueberry Hill must expend significant sums to maintain the fairways and greens. Emergency Petition, ¶ 85. Without paying customers, Blueberry Hill does not have the income to conduct spring fertilization and pest control of the course, and it has had to lay off wait staff, cooks, and professional staff. *Id.* Blueberry Hill is unable to perform its obligations under contracts for the purchase of new or replacement equipment for the 2020 thirty-week golf season, which means it does not have the equipment necessary to perform required operations. *Id.* Because the golf course business is competitive and Blueberry Hill has been working on a slim budget for over a decade, the loss of business will compromise its ability to make its April 2020 payment on a promissory note. *Id.*, ¶¶ 87-89. Moreover, the loss of spring cash flow will undermine its efforts to save revenue for the winter months. *Id.*, ¶ 90. Citing the Governor's and Secretary's admonition and advice that Pennsylvanians need to be outside and breathe in fresh air, Blueberry Hill proposes to operate with COVID-19 prevention protocols in place, as are golf courses in Ohio. *Id.*, ¶¶ 91-92.

Respondents are the Governor of Pennsylvania, Tom Wolf and the Secretary of the Pennsylvania Department of Health, Rachel Levine.

### C. Procedural History of the Case

This matter commenced on March 24, 2020, when Petitioners filed the Emergency Application in this Court, challenging the Executive Order which prohibited all businesses deemed non-life-sustaining from continued operation of their physical locations during the

COVID-19 pandemic. The same day, the Prothonotary of this Court issued a letter advising Respondents that an answer to the Application was due on March 26, 2020, by 4:00 p.m.

After Respondents filed their answer, Petitioners filed an ancillary application for relief on March 26, 2020, asking this Court to allow briefing and oral argument on the Application. On March 27, 2020, this Court granted the request for briefing (but not oral argument) and set an expedited briefing schedule.

In compliance with this Court's briefing schedule, Petitioners filed their brief and reproduced record on March 31, 2020, and Respondents filed their brief on April 3, 2020. In the interim, Petitioners Gregory and Blueberry Hill each filed Supplemental Applications for Relief on April 2, 2020 (the "Supplemental Applications"), requesting that this Court enter an order directing the Governor to move them from the non-life-sustaining list to the life-sustaining list. Gregory argued that she should be permitted to resume her real estate business in light of a "Memorandum on Identification of Essential Critical Infrastructure Workers During the COVID-19 Response" issued by CISA, which memorandum deemed as essential residential and real estate services. Supplemental Application of Gregory, 4/2/2020, ¶¶ 11, 12. Blueberry Hill argued that it should be permitted to resume its business based on the facts that three other states with "stay at home" orders have allowed golf courses to reopen, provided they do so with COVID-19 prevention and mitigation protocols, and Respondents have identified outdoor activities—subject to social distancing—as permissible under Pennsylvania's "stay-at-home" order. Supplemental Petition of Blueberry Hill, 4/2/2020, ¶¶ 10, 12, 13, 16. Respondents filed an answer to the Supplemental Applications on April 3, 2020.

Additionally, on April 3, 2020, and April 6, 2002, respectively, the Cities of Philadelphia and Pittsburgh filed amicus briefs on behalf of Respondents. In their amicus briefs, the Cities of Philadelphia and Pittsburgh both offer strong support for the Governor's Executive Order. The City of Philadelphia notes that given the size and density of its population, it is especially vulnerable to the rapid spread of the disease. It argues that by ordering non-life-sustaining businesses to close, it permits the City to enforce necessary social distancing restrictions. The alternative of attempting to enforce social distancing in all stores and businesses in Philadelphia would be both unsafe and impossible, as the City faces incredible barriers to maintaining sufficient personal protective equipment and manpower to safely monitor business owners' and residents' adherence to physical distancing and hygiene requirements. The City of Pittsburgh indicates that even though the southwest region of Pennsylvania has eighteen hospitals, the rapid spread of COVID-19 would likely lead to an overwhelming of the health care resources available to Pittsburghers and residents of the surrounding areas. It urges the Court to grant King's Bench jurisdiction and to act for the well-being of all of the citizenry in this time of risk and contagion.

On April 3, 2002, the Pennsylvania Association of Realtors ("PAR") filed an amicus brief on behalf of Gregory. PAR argues that it provides vital, life-sustaining services to millions of Pennsylvanians, and that the Governor has improperly prohibited the offering of these services to the public. PAR contends that while this decision was ostensibly made in conjunction with the guidance from CISA, the decision is in fact in contradiction of such guidance. According to PAR, the Governor's decision arbitrarily denies to millions of Pennsylvanians life-sustaining services that must be maintained even in time of public

health crisis. PAR indicates that the undue delay in processing waiver requests has rendered the administrative process utterly ineffective. Further, the administration's position that it has the authority to create and destroy such administrative review process at any moment and at will, thereafter leaving tens of thousands of PAR members without any avenue of administrative or even judicial relief from the shutdown of their businesses, is contrary to the Pennsylvania Constitution and risks opening the floodgates to litigation in the Unified Judicial System.

On April 13, 2020, this Court granted leave to accept the filing of an amicus brief by the Home Builders Association of Bucks and Montgomery Counties and the Home Builders Association of Chester and Delaware Counties.

### D. Summary of the Arguments of the Parties

In their Emergency Application, Petitioners contend that the Governor lacks any statutory authority to issue the Executive Order and further claim that it violates their constitutional rights under the United States and Pennsylvania Constitutions. Petitioners claim that the Executive Order places businesses throughout Pennsylvania at extreme risk of financial hardship and threatens the jobs of hundreds of thousands of our citizens. Petitioners' Brief at 12 ("The severe disruption of the economy has already and will continue to create enormous dislocation and financial strain on the government, businesses and workers; over 650,000 Pennsylvanians have applied for unemployment compensation benefits since the Governor proclaimed his Order[.]"). Petitioners further argue that the Executive Order is unnecessary, as their businesses may be operated to "employ COVID-19 prevention and mitigation practices in their physical offices." Emergency Application, ¶ 25.

Respondents reject Petitioners' statutory and constitutional arguments, positing that the Pennsylvania Constitution and the above-referenced statutory enactments charge the Executive Branch of the state government with combating public health emergencies and providing it with broad powers to do so.[7]  Respondents' Brief at 8. Respondents insist that strict application of social distancing practices is the only potentially effective means for reducing the spread of the disease and saving hundreds of thousands, if not millions, of Pennsylvania lives.  *Id.*  Closure of businesses is one such necessary practice to advance social distancing in order to prevent and suppress transmission.  The selection of which businesses to close requires that a balance be struck:  close too few businesses and the disease will spread uninterrupted, while closing too many will make it impossible for people to access life-sustaining goods and services. *Id.*  Striking that balance, Respondents emphasize, constitutes a proper exercise of the Commonwealth's police powers and provides any due process required under the law, and even if some due process requirement is implicated, a waiver program has been established.  *Id.* at 8-9.

## II.  JURISDICTION

Article V, Section 2 of the Pennsylvania Constitution provides, in relevant part, that the Supreme Court "shall be the highest court of the Commonwealth and in this court

---

[7]  In *Civil Rights Defense Firm v. Governor Tom Wolf,* 63 MM 2020 (per curiam order dated March 22, 2020), this Court denied an Emergency Ex-Parte Application for Emergency Relief pursuant to this Court's King's Bench jurisdiction, which application was based, in part, on the same statutory authority for, and the constitutionality of, the Governor's Executive Order as advanced in the present Emergency Application.  We do not agree with the Respondents' suggestion that our refusal to exercise our King's Bench authority in the former challenge has a dispositive impact on our consideration of the issues presented here.  Respondents' Brief at n.15.

shall be reposed the supreme judicial power of the Commonwealth," Pa. Const. art. V, § 2(a), and further provides that the Supreme Court "shall have such jurisdiction as shall be provided by law." *Id.* at 2(c). The General Assembly has codified our King's Bench authority: "The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722." 42 Pa.C.S. § 502. This Court has observed that "our King's Bench authority is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the ordinary process of law." *Commonwealth v. Williams*, 129 A.3d 1199, 1205–06 (Pa. 2015); *see also In re Bruno*, 101 A.3d 653, 670 (Pa. 2014). We may "exercise King's Bench powers over matters where no dispute is pending in a lower court."[8] *Williams*, 129 A.3d at 1206 (citing *In re Assignment of Avellino*, 690 A.2d 1138, 1140 (Pa. 1997)).

Both Petitioners and Respondents agree that the present action presents an issue of immense public concern and requires immediate judicial resolution. Petitioners' Brief at 13 ("As [Petitioners] challenge the Commonwealth's ability to address the pandemic,

---

[8] An action similar to this Emergency Application is pending (but stayed) in the original jurisdiction of the Commonwealth Court. While generally presenting the same legal claims, there is not an identity of the petitioners in that case with those in this action. Petitioners briefly suggest that as an alternative to granting King's Bench jurisdiction here, we could exercise our extraordinary jurisdiction powers in 42 Pa.C.S. § 726 to assume jurisdiction of the Commonwealth Court action. Petitioners' Brief at 13-14. Under the circumstances, we grant King's Bench jurisdiction to decide the issue raised in the Emergency Application.

these matters present precisely the type of far reaching, public policy concerns that warrant this Court's use of its extraordinary powers."); Respondents' Brief at 7. The Respondents in fact urge this Court to exercise both our King's Bench and extraordinary jurisdiction. *Id.* We agree that this case presents issues of immediate and immense public importance impacting virtually all Pennsylvanians and thousands of Pennsylvania businesses, and that continued challenges to the Executive Order will cause further uncertainty. This Court hereby invokes its King's Bench powers to decide the statutory and constitutional challenges to the Executive Order presented in Petitioners' Emergency Application.

## III. RESPONDENTS' STATUTORY AUTHORITY TO ISSUE THE EXECUTIVE ORDER

The Governor derives broad authority from our Constitution, as it vests him with "supreme executive power" and directs him to "take care that the laws be faithfully executed." Pa. Const. art IV, § 2. As the Commonwealth's chief executive officer, the Governor has primary responsibility for protecting the public safety and welfare of the people of Pennsylvania in times of actual or imminent disasters where public safety and welfare are threatened. 35 Pa.C.S. § 7301(a). As such, the Governor is vested with broad emergency management powers under the Emergency Code. The General Assembly imbedded in the Code its purposes, which include to "[r]educe vulnerability of people and communities of this Commonwealth to damage, injury and loss of life and property resulting from disasters;" to "[p]repare for prompt and efficient rescue, care and treatment of persons victimized or threatened by disaster;" to "[c]larify and strengthen the roles of the Governor, Commonwealth agencies and local government in prevention of, preparation for, response to and recovery from disasters;" to "[a]uthorize and provide for

cooperation in disaster prevention, preparedness, response and recovery" and to "[s]upplement, without in any way limiting, authority conferred by previous statutes of this Commonwealth … ." 35 Pa.C.S. §§ 7103(1), (2), (4), (5), (9). The Code further declares that it does not intend to "[l]imit, modify or abridge the authority of the Governor to proclaim martial law or exercise any other powers vested in him under the Constitution, statutes or common law of this Commonwealth." 35 Pa.C.S. §7104(3).

Section 7301, entitled "General authority of Governor," clarifies the nature of the Governor's powers and responsibilities in disaster situations. First and foremost, the Governor is "responsible for meeting the dangers to this Commonwealth and people presented by disasters." 35 Pa.C.S. § 7301(a). He is further empowered to "issue, amend and rescind executive orders, proclamations and regulations which shall have the force and effect of law." 35 Pa.C.S. § 7301(b). The Governor may, by proclamation or executive order, declare a state of disaster emergency, 35 Pa.C.S. § 3701(b), "upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent." 35 Pa.C.S. § 7301(c). This state of disaster emergency shall continue until the Governor finds that the threat or danger has passed or that emergency conditions no longer exist, but may not continue for longer than ninety days[9] unless renewed by the

---

[9] During the General Assembly's consideration of passage of the Emergency Code in 1977, it made only one significant change to the text of section 7301(c), namely to extend the duration of the period of the Governor's declared disaster emergency from thirty days to ninety days. The National Governors Association notes that ten states require that emergency declarations expire in less than thirty days, sixteen states do not permit emergency declarations to exceed 30 days, and just five states allow emergency declarations to last sixty days or more. *See* National Governors Association Center for Best Practices, The Governor's Guide to Homeland Security at 14 (2007), http://www.nga.org/files/live/sites/NGA/files/pdf/0703GOVGUIDEHS.PDF. As such, Pennsylvania's Governor has the authority to declare one of the longest emergency

Governor. *Id.* As a counterbalance to the exercise of the broad powers granted to the Governor, the Emergency Code provides that the General Assembly by concurrent resolution may terminate a state of disaster emergency at any time. *Id.*

Upon the declaration of a disaster emergency, the Emergency Code vests with the Governor expansive emergency management powers, including, inter alia, to "[s]uspend the provisions of any regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder or delay necessary action in coping with the emergency;" to "[u]tilize all available resources of the Commonwealth Government and each political subdivision of this Commonwealth as reasonably necessary to cope with the disaster emergency;" to "[t]ransfer the direction, personnel or functions of Commonwealth agencies or units thereof for the purpose of performing or facilitating emergency services;" to "[d]irect and compel the evacuation of all or part of the population from any stricken or threatened area within this Commonwealth if this action is necessary for the preservation of life or other disaster mitigation, response or recovery;" to "[c]ontrol ingress and egress to and from a disaster area, the movement of persons within the area and the occupancy of premises therein;" and to "[s]uspend or limit the sale, dispensing or

---

declarations of any governor in the United States. Patricia Sweeney, JD, MPH, RN, Ryan Joyce, JD, *Gubernatorial Emergency Management Powers: Testing the Limits in Pennsylvania*, 6 Pitt. J. Envtl Pub. Health L. 149, 177 (2012).

With this revision to section 7301(c), the Emergency Code passed by unanimous votes in both chambers of the General Assembly. H. Journal, 162nd Gen. Assemb., vol. 5, at 3662-63 (Pa. Nov. 14, 1978) (190-0). S. Journal, 162nd Gen. Assemb., vol. 2, at 1167 (Pa. Nov. 15, 1978) (47-0).

transportation of alcoholic beverages, firearms, explosives and combustibles." 35 Pa.C.S. §§ 7301(f)(1),(2),(3),(7),(8).[10]

The broad powers granted to the Governor in the Emergency Code are firmly grounded in the Commonwealth's police power. *See generally Rufo v. Board of License and Inspection Review*, 192 A.3d 1113, 1120 (Pa. 2018). This Court has defined the Commonwealth's police power as the power "to promote the public health, morals or safety and the general well-being of the community." *Pa. Restaurant & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 817 (Pa. 2019). In *Nat'l Wood Preservers, Inc. v. Dep't of Envt'l Protection*, 414 A.2d 37, 42 (Pa. 1980), we described the police power as the state's "inherent power of a body politic to enact and enforce laws for the protection of the general welfare," and thus, it is both one of the "most essential powers of the government" and its "least limitable power." *Id.* at 42- 43.

> The police power is fundamental because it enables "civil society" to respond in an appropriate and effective fashion to changing political, economic, and social circumstances, and thus to maintain its vitality and order. *See, e. g., Mugler v. Kansas*, 123 U.S. 623 (1887). The police power of the state [must therefore be] ... as comprehensive as the demands of society require under the circumstances. *Comm. v. Barnes & Tucker II*, 371 A.2d 461, 467 (Pa. 1977). Of necessity, then, the police power is a broad and flexible power. *See, e. g.,*

---

[10] As detailed in this Opinion, our analysis of the Emergency Code and our statutory construction of the provisions implicated by Petitioners leads us to conclude that it provides the authority for the Governor's issuance of the Executive Order. Thus, we will not discuss the parties' arguments based on the Administrative Code or the Disease Act. While we recognize the vital role played by the Secretary and her department in advising the Governor of the public health implications of COVID-19 and the most appropriate methods to suppress and contain it, we find ample support in the Emergency Code's direct authorization of the promulgation of the Executive Order without the necessity of an interpretation of the Department of Health's authority under the Disease Act or Administrative Code.

> *Berman v. Parker*, 348 U.S. 26 (1954); *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926).

*Id.*; *see also Grime v. Dep't of Instruction*, 188 A. 337, 341 (Pa. 1936) ("[B]usiness can be regulated under the police power because of its relation to health").

Petitioners do not challenge that there are far-reaching powers granted to the Governor under the Emergency Code. Instead, Petitioners challenge the applicability of these powers in response to a viral illness like COVID-19, and further contend that even if there is any applicability, no power has been conferred that would permit Respondents to close their businesses. Petitioners' Brief at 21. Because consideration of Petitioners' arguments require that we engage in statutory interpretation, we note that when doing so a court's duty is to give effect to the legislature's intent and that the best indication of legislative intent is the plain language of the statute. 1 Pa.C.S. § 1921(a); *Roverano v. John Crane, Inc.*, 2020 WL 808186, at \*7 (Pa. Feb. 19, 2020); *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist.*, 185 A.3d 282, 290-91 (Pa. 2018).

The provisions of the Emergency Code apply to "disasters." The Emergency Code defines "disaster" as "[a] man-made disaster, natural disaster or war-caused disaster."[11] 35 Pa.C.S. § 7102. Of relevance here, "natural disaster" is defined as follows:

> Any hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, landslide, mudslide,

---

[11] The Emergency Code defines a "man-made disaster" as "[a]ny industrial, nuclear or transportation accident, explosion, conflagration, power failure, natural resource shortage or other condition, except enemy action, resulting from man-made causes, such as oil spills and other injurious environmental contamination, which threatens or causes substantial damage to property, human suffering, hardship or loss of life." 35 Pa. C.S. § 7102. A "war-caused disaster" is any "condition following an attack upon the United States resulting in substantial damage to property or injury to persons in the United States caused by use of bombs, missiles, shellfire, nuclear, radiological, chemical or biological means, or other weapons or overt paramilitary actions, or other conditions such as sabotage." *Id.*

snowstorm, drought, fire, explosion **or other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life.**

*Id.* (emphasis added). Upon finding that a disaster has occurred, the Governor is required to declare a disaster emergency, 35 Pa.C.S. § 7301(c), which the statute defines as:

Those conditions which may by investigation made, be found, actually or likely, to:

(1) affect seriously the safety, health or welfare of a substantial number of citizens of this Commonwealth or prelude the operation or use of essential public facilities;

(2) be of such magnitude or severity as to render essential State supplementation of county and local efforts or resources exerted or utilized in alleviating the danger, damage, suffering or hardship faced; and

(3) have been caused by forces beyond the control of man, by reason of civil disorder, riot or disturbance, or by factors not foreseen and not known to exist when appropriation bills were enacted.

35 Pa.C.S. § 7102 (definitions). Upon the declaration of a disaster emergency, the Governor gains broad powers, including, inter alia, controlling the "ingress and egress to and from a disaster area, the movement of person within the area and the occupancy of premises therein." 35 Pa.C.S. § 7301(f)(7).

Petitioners contend that the COVID-19 pandemic is not a natural disaster as defined by the Emergency Code. They raise an ambiguity in the statute, thus, they argue, triggering our resort to the principles of statutory construction. Petitioners argue that although the definition uses the phrase "and other catastrophes," because viral illness is not included in the list of applicable disasters, COVID-19 cannot be a natural disaster because it is not of the same type or kind as those on the list. Petitioners' Brief at 15. While implicitly acknowledging that a viral illness like COVID-19 might qualify under the definition's reference to "other catastrophes," Petitioners insist that the Court must apply

the contextual canon of ejusdem generis ("of the same kind"), which prevents the expansion of a list of specific items to include other items not "of the same kind" as those expressly listed. *Id.* at 16-18. Respondents disagree, contending that the COVID-19 pandemic "unquestionably fits the definitions of 'disaster' and 'disaster emergency', and is precisely the circumstance that the General Assembly had in mind with it enacted the statute." Respondents' Brief at 15. Respondents contend that the term "other catastrophe'" is expansive and is not limited by the specifically enumerated items on the list. *Id.* at 15-16.

As of this writing, 24,199 of Pennsylvania's citizens have been confirmed by testing to have been infected with COVID-19; 524 have died. Department of Health, "COVID-19 Data for Pennsylvania," https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed 4/8/2020). COVID-19's spread is exponential as demonstrated by the fact that there were 851 confirmed cases on March 24, 2020, the date this Application was filed. *Id.* It is beyond dispute that the COVID-19 pandemic is unquestionably a catastrophe that "results in … hardship, suffering or possible loss of life." The issue, then, is whether it nevertheless may not be classified as a "natural disaster" caused by unforeseen factors based upon the application of the doctrine of ejusdem generis. This Court has described the doctrine as follows:

> Under the statutory construction doctrine of ejusdem generis ("of the same kind or class"), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated.

*Indep. Oil & Gas Ass'n of Pa. v. Bd. of Assessment Appeals*, 814 A.2d 180, 184 (Pa. 2002).

We agree with Respondents that the COVID-19 pandemic qualifies as a "natural disaster" under the Emergency Code for at least two reasons. First, the specific disasters in the definition of "natural disaster" themselves lack commonality, as while some are weather related (e.g., hurricane, tornado, storm), several others are not (tidal wave, earthquake, fire, explosion). To the contrary, the only commonality among the disparate types of specific disasters referenced is that they all involve "substantial damage to property, hardship, suffering or possible loss of life." In this respect, the COVID-19 pandemic is of the "same general nature or class as those specifically enumerated," and thus is included, rather than excluded, as a type of "natural disaster."

We further note that while ejusdem generis is a useful tool of statutory construction, such tools are used for the sole purpose of determining the intent of the General Assembly. Ejusdem generis must yield in any instance in which its effect would be to confine the operation of a statute within narrower limits that those intended by the General Assembly when it was enacted. *See Dep't of Assess. & Tax. v. Belche*r, 553 A.2d 691, 696 (Md. 1989) ("[T]he general words will not be restricted in meaning if upon a consideration of the context and the purpose of the particular statutory provisions as a whole it is clear that the general words were not used in the restrictive sense."). *See also Danganon v. Guardian Protective Services*, 179 A.3d 9 (Pa. 2018) (Consumer Protection Law which has "and includes" in definition of trade and commerce interpreted broadly along with liberal interpretation of CPL as remedial legislation). By setting forth a general list of catastrophes and then including the language "other catastrophe which results in

substantial damage to property, hardship, suffering or possible loss of life," it is clear that the General Assembly intended to **expand** the list of disaster circumstances that would provide Respondents with the necessary powers to respond to exigencies involving vulnerability and loss of life. There is nothing in the Emergency Code to indicate that the General Assembly intended in any way to narrow the operation of the statute or the Governor's authority. To the contrary, the General Assembly's stated goals, as set forth in the Emergency Code, were to, inter alia, "[r]educe vulnerability of people and communities of this Commonwealth to damage, injury and loss of life and property resulting from disasters," and to "strengthen" the Governor's role "in prevention of, preparation for, response to and recovery from disasters." 35 Pa.C.S. § 7103(1),(4). The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions. Its presence in and movement through Pennsylvania triggered the Governor's authority under the Emergency Code.

Petitioners alternatively argue that even if the COVID-19 pandemic constitutes a "disaster" under the Emergency Code, the power granted to the Governor under 35 Pa.C.S. § 7301(f)(7) to "[c]ontrol ingress and egress to and from a disaster area, the movement of persons within the area and the occupancy of premises therein" does not include any ability to close their businesses. Petitioners' Brief at 21. Petitioners contend that this provision only authorizes the Governor to act in a "disaster area," and there have been no disasters in the areas in which their businesses are located. *Id.* at 22. We find no merit in this argument. First, Respondents correctly note that COVID-19 cases have been reported in the counties in which Petitioners' businesses are located (Allegheny, Northampton and Warren Counties). Respondents' Brief at 24. In fact, COVID-19 cases

have now been reported in all counties in the Commonwealth. Department of Health, "COVID-19 Data for Pennsylvania," https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed 4/8/2020). More fundamentally, Petitioners' argument ignores the nature of this virus and the manner in which it is transmitted. The virus spreads primarily through person-to-person contact, has an incubation period of up to fourteen days, one in four carriers of the virus are asymptomatic, and the virus can live on surfaces for up to four days. Thus, any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.

We further note that the Emergency Code provides that, upon the declaration of a disaster emergency (as occurred here), the Governor has expansive emergency management powers including to "direct and compel the evacuation of all or part of the population from any stricken or threatened area within this Commonwealth if this action is necessary for the preservation of life or other disaster mitigation, response or recovery." 37 Pa.C.S. §§ 7301(f)(3). While the Governor took far less extreme measures with the closure of certain businesses, to the extent Petitioners are suggesting that the Governor lacked the authority to do so, this statutory authorization of a much more drastic measure disproves the point. Thus, the Executive Order's closure of non-essential businesses in Pennsylvania is authorized by Section 7307(f)(7) of the Emergency Code.

Based on the foregoing, we conclude that the COVID-19 pandemic triggered the Governor's authority under the Emergency Code and that as a result of the COVID-19 pandemic, the Governor had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area.

Finally, in addition to their challenges based on the statutory language of the Emergency Code, Petitioners argue that Respondents, by ordering closure of all businesses deemed to be non-life-sustaining, have exceeded the permissible scope of their police powers. Petitioners cite the United States Supreme Court's decision in *Lawton v. Steele*, 152 U.S. 133 (1894), for the "police powers" test:

> To justify the state in thus interposing its authority in behalf of the public, it must appear – First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Lawton*, 152 U.S. at 137 (cited by *Nat'l Wood Preservers v. Comm. Dept. of Envtl Res.*, 414 A.2d 37, 43 (Pa. 1980)). Petitioners make three arguments to demonstrate that Respondents exceeded their authorized police power. First, Petitioners claim that the public's interests are not served by the mass closure of businesses, as the public has an interest in continuing to receive the goods and services of these businesses. Petitioners' Brief at 24. Second, Petitioners insist that shuttering their businesses is unnecessary for the prevention of the spread of COVID-19 where the disease has not been detected at their places of business. *Id.* Third, Petitioners contend that closing their businesses was unduly burdensome to them and was, in fact "just about the most burdensome thing that can happen to a business, particularly businesses such as golf courses which cannot function anywhere but from their physical places of business." *Id.* at 24-25.

Under the exigencies created by the spread of the coronavirus and the critical interests of the public, generally, Petitioners cannot prevail in their arguments. As to the predicate requirements that the interests of the public justify the Governor's assertion of its authority, the nature of this emergency supports it. COVID-19 spreads "exponentially."

Respondents report that in Pennsylvania, from the date they filed their answer to the Emergency Application (March 26, 2020) to the date they filed their brief (April 3, 2020) the number of reported cases increased from 1,687 to 7,016 and the number of deaths increased from 16 to 90.  Respondents' Brief at 2.  To punctuate the point and as noted previously (supra at 23), as of this writing, 24,199 of Pennsylvania's citizens have been confirmed to have been infected and 524 have died.  The enforcement of social distancing to suppress transmission of the disease is currently the only mitigation tool.  Department of Health, "COVID-19 Data for Pennsylvania," https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed 4/8/2020).  Recent models for the COVID-19 pandemic predict that about 60,000 Americans will die. Peter Baker, "Trump Confronts a New Reality Before an Expected Wave of Disease and Death," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/us/politics/coronavirus-trump.html (60,400 deaths predicted).  Although a staggering death toll, it is lower than earlier predictions that between 100,000 and 240,000 Americans would die – even if the nation abided by social distancing.  Respondents' Brief at 2-3 (citing Peter Baker, "Trump Confronts a New Reality Before an Expected Wave of Disease and Death." *Id.*  The reason for the drop in the death toll projection is the enforcement of social distancing mechanisms and citizen's compliance with them.  Quint Forgey, "Trump's top health officials predict diminished coronavirus death toll," Politico (Apr. 7, 2020) https://www.politico.com/news/2020/04/07/trumps-top-health-officials-predict-diminished-coronavirus-death-toll-171456.

Against this backdrop, Petitioners suggest that the public interest would best be served by keeping businesses open to maintain the free flow of business. Although they cite to none, we are certain that there are some economists and social scientists who support that policy position. But the policy choice in this emergency was for the Governor and the Secretary to make and so long as the means chosen to meet the emergency are reasonably necessary for the purpose of combating the ravages of COVID-19, it is supported by the police power. The choice made by the Respondents was tailored to the nature of the emergency and utilized a recognized tool, business closures, to enforce social distancing to mitigate and suppress the continued spread of COVID-19. *See* Respondents' Answer at 3.

Petitioners' second argument, namely that there is no significant risk of the spread of COVID-19 in locations where the disease has not been detected (including at their places of business), is similarly unpersuasive. As previously discussed, COVID-19 does not spread because the virus is "at" a particular location. Instead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed 4/9/2020)). The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures

Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

Finally, Petitioners contend that their businesses should be permitted to remain open because of the burden placed on them. We recognize the serious and significant economic impact of the closure of Petitioners' businesses. However, the question is whether it is **unduly oppressive**, thus negating the utilization of the police power. Faced with protecting the health and lives of 12.8 million Pennsylvania citizens, we find that the impact of the closure of these businesses caused by the exercise of police power is not unduly oppressive. The protection of the lives and health of millions of Pennsylvania residents is the sine qua non of a proper exercise of police power.

## IV. CONSTITUTIONAL CHALLENGES

Petitioners advance five intermingled constitutional arguments in support of their claim that the Executive Order should be vacated even if the Governor was authorized to issue it. Petitioners contend that the Executive Order violates the separation of powers doctrine; that the Executive Order constitutes a taking requiring just compensation; that Petitioners were not accorded procedural due process in the compilation of the list of life-sustaining and non-life-sustaining businesses or in the waiver process and that both are arbitrary, capricious and vague; that it violates equal protection principles; and that the Executive Order interferes with DeVito Committee's right of free speech and assembly. We address these arguments in turn.

### 1. Separation of Powers

The entirety of the Petitioners' challenge to the Executive Order as a violation of the Separation of Powers Doctrine follows:

> Executive orders can be classified into three permissible types: (1) proclamations for ceremonial purposes; (2) directives to subordinate officials for the execution of executive branch duties; and (3) interpretation of statutory or other law. *Markham v. Wolf*, 647 Pa. 642 (2018). Type 3 is implicated in this matter. "[A]ny executive order that, in essence, creates law, is unconstitutional." *Id.* at 656. The governor's comprehensive, detailed determination of which types of businesses "may continue physical operations" constitutes an attempt at legislation, which is the exclusive province of the legislative branch of government. *Id.* ("Foundationally, the legislature creates the laws. Pa. Const. art. II, § 1"). The governor, in attempting to legislate which businesses may operate from their physical locations and which may not, has violated the principles of separation of powers articulated and applied by the Pennsylvania Supreme Court in *Markham*.

Petitioners' Brief at 37.

The Emergency Code belies Petitioners' position. The Emergency Code specifically recognizes that under its auspices, the Governor has the authority to issue executive orders and proclamations which shall have the full force of law. 35 Pa.C.S. § 7301(b). Moreover, as previously explained, the General Assembly, by and through its enactment of the Emergency Code, specifically and expressly authorizes the Governor to declare a disaster emergency and thereafter to control the "ingress and egress to and from a disaster area, the movement of persons within the area and the occupancy of premises therein." 35 Pa.C.S. § 7301(c), (f)(7). Inherent in that authorization is the Governor's ability to identify the areas where movement of persons must be abated and which premises will be restricted in order to mitigate the disaster. That the Governor utilized business classifications to determine the appropriate areas and premises to be directly impacted by the disaster mitigation is likewise inherent in the broad powers authorized by the General Assembly. Accordingly, the Executive Order does not violate the Separation of Powers Doctrine.

## 2. Takings Without Compensation

Petitioners claim that because the Executive Order prohibits them from using their property[12] "at all," it resulted in a taking of private property for public use without the payment of just compensation, in violation of the Fifth Amendment to the United States Constitution[13] and Article I, Section 10 of the Pennsylvania Constitution.[14] According to Petitioners, a taking need not involve a physical taking of the property to implicate the constitutional protections requiring just compensation. Petitioners' Brief at 41. Instead,

---

[12] Blueberry Hill is the owner of the property upon which the business is conducted. Emergency Application, ¶ 83. While Blueberry Hill claims that it is deprived of the use of its property in total, we note that it continues to operate on a take-out basis, the restaurant located on the property. Petitioners' Brief at 49. The record here does not establish what property interests, if any, that Petitioners DeVito Committee and/or Gregory purport to hold. Accordingly, as one petitioner (Blueberry Hill) has standing to assert a takings claim, we will proceed to consider the issue on its merits.

[13] The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

[14] Article 1, Section 10 provides:

> [N]o person shall, for any indictable offense, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger, or by leave of the court for oppression or misdemeanor in office. Each of the several courts of common pleas may, with the approval of the Supreme Court, provide for the initiation of criminal proceedings therein by information filed in the manner provided by law. No person shall, for the same offense, be twice put in jeopardy of life or limb; nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

referring to the Executive Order as a government regulation, Petitioners argue that it is sufficient if a governmental regulation "deprive[s] an owner of all economically beneficial or productive use of land…" *Id.* (citing *Machipongo Land & Coal Co. v. Dept. of Envtl. Prot.*, 799 A.2d 751, 754 (Pa. 2002)).

Respondents point out that there is a critical distinction between the exercise of the police power, as here, and takings pursuant to eminent domain. They cite to a long line of Pennsylvania cases holding that the payment of just compensation is not required where the regulation of property involves the exercise of the Commonwealth's police power. Beginning with *Appeal of White*, 134 A. 409 (Pa. 1926), this Court made the distinction:

> Under eminent domain, compensation is given for property taken, injured, or destroyed, while under the police power no payment is made for a diminution in use, even though it amounts to an actual taking or destruction of property. Under the Fourteenth Amendment, property cannot be taken except by due process of law. **Regulation under a proper exercise of the police power is due process, even though a property in whole or in part is taken or destroyed.** The conditions on which its legitimate exercise is predicated should actually exist or their happening be so likely that restraint is necessary, similar to a court issuing a restraining order for injuries done or threatened to persons or property. Likewise, there should be a reasonable and substantial relation between the thing acted on and the end to be attained[.]

*Id.* at 411 (emphasis added).

Following *White*, this Court in *Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995), again indicated that where governmental regulation restricting activity on private property is implemented pursuant to an exercise of police power, rather than through the government's power of eminent domain, no just compensation is due:

> Eminent domain is the power to take property for public use. The City must provide just compensation for any property taken pursuant to this power. The police power, on the other hand, involves the regulation of property to promote the health, safety and general welfare of the people. *White's Appeal*, 287 Pa. 259, 134 A. 409 (1926). **It does not require that the City provide compensation to the property owner, even if the property is damaged or destroyed.** *Id.*

*Id.* at 314 (emphasis added); *see also Estate of Blose ex rel. Blose v. Borough of Punxsutawney*, 889 A.2d 653, 657–58 (Pa. Commw. 2005); *Commonwealth v. Hinds*, 775 A.2d 859, 864 (Pa. Super. 2001).

The *Balent* case, however, differed in one important respect from the allegations made by Petitioners here. In *Balent*, the city of Wilkes-Barre demolished a structure that had been partially destroyed by fire. *Balent*, 669 A.2d at 311-12. While the structure was lost, the owners retained ownership of the property. Thus, unlike Petitioners' claim here, in *Balent*, there was no claim that the governmental action resulted in a loss of "all economically beneficial or productive use of land." Petitioners' Brief at 45 ("The Governor's Order … is a restriction or interruption of the common and necessary use and enjoyment of property as it deprives Petitioners from using or operating their businesses at their physical location[.]") (citing *Andress v. Zoning Bd. of Adjustment*, 188 A.2d 77, 85 (Pa. 1963) ("[A]ny destruction, restriction or interruption of the common and necessary use and enjoyment of property in a lawful manner may constitute a taking for which compensation must be made to the owner of the property[.]")).

Based upon this distinction, Petitioners insist that the principle governing their claims is found in the United States Supreme Court's decision in *Lucas v. S.C. Coastal Counsil*, 505 U.S. 1003 (1992). In *Lucas*, petitioner Lucas bought two residential lots on a South Carolina barrier island, intending to build single-family homes such as those on

the immediately adjacent parcels. Before construction, however, the state legislature enacted a new law barring the erection of any permanent habitable structures on the parcels he had purchased. Lucas filed suit, arguing that even if the new legislation constituted a lawful exercise of the State's police power, the ban on construction deprived him of all "economically viable use" of his property and therefore effected a "taking" requiring the payment of just compensation. Noting Justice Holmes' prior opinion in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), that "if regulation goes too far it will be recognized as a taking," *id.* at 415, the Court in *Lucas* held that generally when a regulation deprives an owner of "all economically beneficial uses" of the land, it constitutes a regulatory taking requiring the payment of just compensation. *Id.* at 1016.

We do not find that either *Balent* or *Lucas* is controlling. Instead, we rely on a subsequent Supreme Court decision, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002), for our disposition. In that case, respondent Tahoe Regional Planning Agency ("TRPA") imposed two moratoria, totaling thirty-two months, on development in the Lake Tahoe Basin while formulating a comprehensive land-use plan for the area. Petitioners, real estate owners affected by the moratoria and an association representing such owners, filed parallel suits, later consolidated, claiming that TRPA's actions had taken all viable economic uses of their property without compensation. Rather than apply its prior decision in *Lucas*, however, the Court recognized that while the regulation in *Lucas* stated that the ban on development "was unconditional and permanent," the regulations at issue in the case before it were merely temporary measures, which specifically stated that they would terminate. *Id.* at 329. As a result, the High Court affirmed the United States Court of Appeals for the Ninth Circuit's

decision that because the regulations had only a temporary impact on petitioners' fee interest, no categorical taking had occurred. *Id.* at 342 (noting that "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim"). In so holding, the Court stated that "the extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained," as it would apply to numerous "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like, as well as to orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee … which have long been considered permissible exercises of the police power, which do not entitle the individuals affected to compensation." *Id.* at 334-35.

The United States Court of Appeals for the Third Circuit relied upon *Tahoe-Sierra* in a case involving an emergency situation bearing similarities to the present disaster crisis. In *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57 (3d Cir. 2013), the Borough of Palmyra ordered closed for five months an open-air flea market, owned and operated by National Amusements, Inc. ("NAI"), due to safety concerns posed by unexploded munitions left behind when the site had been used as a weapons-testing facility for the United States Army. Relying on the holding in *Tahoe-Sierra*, the court of appeals categorically denied that a regulatory taking had occurred requiring the payment of just compensation:

> It is difficult to imagine an act closer to the heartland of a state's traditional police power than abating the danger posed by unexploded artillery shells. Palmyra's emergency action to temporarily close the Market therefore constituted an exercise of its police power that did not require just compensation.

*Id.* at 63.

Applying *Tahoe-Sierra* and *Nat'l Amusements Inc.* to the present facts, we conclude that Petitioners have not established that a regulatory taking has occurred. The Executive Order results in only a temporary loss of the use of the Petitioners' business premises, and the Governor's reason for imposing said restrictions on the use of their property, namely to protect the lives and health of millions of Pennsylvania citizens, undoubtedly constitutes a classic example of the use of the police power to "protect the lives, health, morals, comfort, and general welfare of the people[.]" *Manigault v. Springs*, 199 U.S. 473, 480 (1905). We note that the Emergency Code temporarily limits the Executive Order to ninety days unless renewed and provides the General Assembly with the ability to terminate the order at any time. 35 Pa.C.S. § 7301(c). Moreover, the public health rationale for imposing the restrictions in the Executive Order, to suppress the spread of the virus throughout the Commonwealth, is a stop-gap measure and, by definition, temporary. While the duration of COVID-19 as a natural disaster is currently unknown, the development of a vaccine to prevent future outbreaks, the development of an immunity in individuals previously infected and the availability of widespread testing and contact tracing are all viewed as the basis for ending the COVID-19 disaster.[15]

---

[15] See remarks by Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases:

National Institute of Allergy and Infectious Diseases, "NIH Clinical Trial of Investigational Vaccine for COVID-19 Begins," NIH (Mar. 16, 2020) https://www.niaid.nih.gov/news-events/nih-clinical-trial-investigational-vaccine-covid-19-begins; Peter Sullivan, "Fauci: Improved testing and tracing can help reopen country," The Hill (Apr. 1, 2020) https://thehill.com/homenews/administration/490713-fauci-improved-testing-and-tracing-can-help-reopen-country; Hayden Bird, "5 important points from Dr. Anthony Fauci's interview on 'The Daily,'" Boston.com (Apr. 2, 2020) https://www.boston.com/news/health/2020/04/02/5-important-points-from-dr-faucis-interview-on-the-daily.

### 3. Procedural Due Process

Petitioners next contend that they have been deprived of procedural due process.[16]  Petitioners claim that the Executive Order, with its list distinguishing between life-sustaining and non-life-sustaining businesses, took effect without providing them with notice and an opportunity to be heard with respect to their placement on the list. Petitioners' Brief at 40, 46.  Petitioners further argue that any waiver process must accord applicants procedural due process prior to final determinations, including, e.g., the right to know the applicable standards to be applied, to present and/or cross-examine witnesses, and to the availability of an appeal from an adverse result.  *Id.* at 52.

From the Petitioners' arguments, we discern three procedural due process issues for our consideration.  First, were Petitioners entitled to pre-deprivation notice and an opportunity to be heard prior to the Governor's entry of the Executive Order containing the list placing them in the non-life-sustaining category requiring the closure of their physical business operations.  Second, if Petitioners were not entitled to pre-deprivation due process, were they entitled to post-deprivation due process protections.  Finally, if the answer to the second issue is in the affirmative, does the Governor's waiver process

---

[16]  Petitioners' brief does not indicate whether the due process claim asserted is in the nature of one for procedural due process or substantive due process.  In responding to Petitioners' arguments, Respondents understood Petitioners to be asserting infringements of only their **procedural** due process rights.  Respondents' Brief at 33 n.18. We agree, as Petitioners cite to cases identifying the fundamental hallmarks of procedural due process ("notice and a meaningful opportunity to be heard"), *see* Petitioners' Brief at 40 (citing *Harris v. City of Phila.*, 47 F.3d 1333, 1335 (3d Cir. 1995)), and the types of procedural safeguards typically available (e.g., notice, a neutral arbitrator, an opening statement, an opportunity to present and cross-examine witnesses, representation by counsel, and a decision on the record stating the reasons for the result), *see Rogin v. Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir. 1980)).  Accordingly, we will proceed to consider the procedural due process claims raised by Petitioners.

constitute sufficient post-deprivation due process under the circumstances presented here.

With respect to the first issue, Petitioners, without any argument or citation to authority, insist that they were entitled to the full panoply of procedural due process rights to challenge the Executive Order (containing the list placing them in the non-life-sustaining category) prior to its entry. Petitioners' Brief at 46 ("[T]he placing of Petitioners' businesses on the non-life-sustaining list and forcing their closing constituted a deprivation of the property interests of the Petitioners, and as such the Governor was required to provide Petitioners with due process **before the taking**.") (emphasis in original). An entity's entitlement to procedural due process, however, cannot be determined in a static environment, since due process is "not a technical conception with a fixed content unrelated to time, place and circumstance." *Gilbert v. Hoover*, 520 U.S. 924, 930 (1997). "[N]ot all situations calling for procedural safeguards call for the same kind of procedure," *Commonwealth v. Batts*, 163 A.3d 410, 455 (Pa. 2017), and the "amount of due process that is due in any particular circumstance is flexible and calls for such procedural protections as the particular situation demands." *Comm. Dep't of Transp., Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060, 1064 (Pa. 1996).

In *In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712 (Pa. 2018), this Court recently reaffirmed that the amount of process that is due in any particular circumstance must be determined by application of the three-part balancing test first established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 717. This balancing test considers three factors: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute

safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state. *Id.*

In *Bundy v. Wetzel*, 184 A.3d 551 (Pa. 2018), this Court also clarified that whether pre-deprivation notice is required largely depends upon the second *Mathews* factor. *Id.* at 557. We indicated that while there is a general preference that procedural safeguards apply in the pre-deprivation timeframe, *Pa. Coal Mining Ass'n v. Ins. Dep't,* 370 A.2d 685, 692 (Pa. 1977); *Zinermon*, 494 U.S. at 127–28, the "controlling inquiry" in this regard is "whether the state is in a position to provide for pre-deprivation process." *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) ("'[T]he necessity of quick action by the State or the impracticality of providing any pre-deprivation process' may mean that a post-deprivation remedy is constitutionally adequate.").

Under the circumstances presented here, namely the onset of the rapid spread of COVID-19 and the urgent need to act quickly to protect the citizens of the Commonwealth from sickness and death, the Governor was not in a position to provide for pre-deprivation notice and an opportunity to be heard by Petitioners (and every other business in the state on the non-life-sustaining list). The result would have been to delay the entry of the Executive Order by weeks, months, or even years, an entirely untenable result given the duties and obligations placed on the Governor under the Emergency Code to abate the looming disaster. As such, Petitioners were not entitled to pre-deprivation notice and an opportunity to be heard.

We cannot agree, however, with Respondents' contention that Petitioners were not entitled to any procedural due process, either before or after the entry of the Executive

Order.  Respondents' Brief at 35 ("Viewing the present public health emergency through a *Mathews* lens, it is apparent what balance is to be struck. … No additional safeguards are feasible, and the countervailing public interest is beyond debate.").  The Supreme Court has held that at all times, even when the country is at war, essential liberties remain in effect.  *Bell v. Burson*, 402 U.S. 535, 542 (1971).

> It is fundamental that the great powers of Congress to conduct war and to regulate the Nation's foreign relations are subject to the constitutional requirements of due process.  The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action.  "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances."

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963).

While procedural due process is required even in times of emergency, we conclude that the waiver process provides sufficient due process under the circumstances presented here.[17]  The Supreme Court has acknowledged that a different level of process

---

[17] We agree with Respondents' contention that an appellant may not assert a procedural due process claim if he has not availed himself of an available grievance procedure. Respondents' Brief at 32-33.  In *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000), the Third Circuit held, "In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."  *Id.* at 116.  The court of appeals stated that "a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."  *Id.* (quoting *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.1982)).  According to the federal court, a due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."  *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113 (1990)).  If there is a process on the books that appears

may be sufficient in times of emergency. *Bell*, 402 U.S. at 542. As the High Court acknowledged in *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." *Id.* at 300–01.

The waiver process provides precisely that, namely a summary procedure that provides businesses with an opportunity to challenge the Governor's placement of their business on the non-life-sustaining list. Seen in this light, it is clear that the term "waiver" is a misnomer in the present context. Instead, the "waiver" process is in actuality a review process that provides businesses an opportunity to challenge, and the Governor's office to reconsider, whether the placement of a business on the non-life-sustaining list was a proper categorization. According to public announcements by the Governor, businesses categorized as non-life-sustaining may file a "waiver" application in which they can attempt to demonstrate either that they provide goods or services that are necessary to maintain operations at a business on the life-sustaining list or that they belong in one of the critical infrastructure categories outlined in the CISA. Richard E. Coe, "Pennsylvania

---

to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. *Id.*

Here Gregory has not filed a waiver application. Blueberry Hill filed a waiver application on March 23, 2020, but has to date received no response. Petitioners' Brief at 7-8 n.1. DeVito Committee filed a waiver application on March 31, 2020 and received a denial letter on April 3, 2020. Supplemental Application for Relief on behalf of DeVito Committee, ¶ 16. Because one of the Petitioners (DeVito Committee) has standing to assert a procedural due process challenge to the waiver process, we will proceed to consider the issue on its merits.

Grants Waivers Allowing Non-'Life-Sustaining' Businesses to Resume Operations," (Apr. 1, 2020), https://www.natlawreview.com/article/pennsylvania-grants-waivers-allowing-non-life-sustaining-businesses-to-resume. This procedure establishes the criteria to defeat the categorization as a non-life-sustaining business. The "waiver" process does not exist to provide waivers to businesses that are not life-sustaining, but rather constitutes an attempt to identify businesses that may have been mis-categorized as non-life-sustaining.

The Governor's efforts to correct mis-categorizations of certain businesses is an entirely proper focus of procedural due process. Procedural due process is geared toward protecting individuals from the **mistaken** deprivation of life, liberty or property. As the United States Supreme Court explained in *Carey v. Piphus*, 435 U.S. 247 (1978):

> Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). Such rules "minimize substantively unfair or mistaken deprivations of" life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. *Fuentes v. Shevin, supra*, 407 U.S., at 81, 92 S.Ct., at 1994.

*Id.* at 259-60.

Petitioners contend the "waiver" process by way of a summary administrative proceeding is arbitrary and capricious because they are denied a formal hearing, at which they may, inter alia, make opening presentations, enter evidence, and present and cross-examine witnesses. Petitioners' Brief at 52. As of the filing of the Respondents' brief, however, more than 34,000 waiver applications have been filed, Michael Rubinkam and

Mark Scolforo, "Deadline Looms for Pennsylvania Virus-Shutdown Waivers," Associated Press (Apr. 2, 2020) https://www.usnews.com/news/best-states/pennsylvania/articles/2020-04-02/state-sets-deadline-for-exemptions-from-wolf-shutdown-order, and it would be impossible, given available resources, to provide the level of due process suggested by Petitioners to every applicant (or any significant percentage of them) and to reach final determinations with respect to the merits of those applications in a timeframe commensurate with the existence of the disaster so that relief could be afforded.

In this regard, we consider the appropriateness of the due process afforded in light of the fact that the loss of Petitioner' property rights are temporary and find this significant. The temporary deprivation impact effects each of the factors in the *Mathews* balancing test. While the private interest, the closure of the business, is important, the risk of erroneous temporary deprivation does not outweigh the value of additional or substitute safeguards which could not be provided within a realistic timeframe. The government interest in focusing on mitigation and suppression of the disaster outweighs the massive administrative burden of the additional procedural requirements demanded by Petitioners. These procedural requirements would overwhelm an entire department of government otherwise involved with disaster mitigation.

We make the further observation that the summary procedure of a review of an application for a waiver meets the exigency of this disaster – social distancing. As conceived by the Petitioners, due process requires in person testimonials, cross-examination and oral argument. Thus, not only would massive numbers of staff be necessary (who would be working from home) but troves of telecommunication devices

would be necessary to accomplish it. The near impossibility of such procedures contrasted with the temporary deprivation at issue here drives the conclusion that the waiver process, as designed, provides an adequate opportunity for Petitioners to make their case for reclassification. Under the circumstances of an ongoing disaster emergency, a full evidentiary proceeding is not a viable post-deprivation procedural process.[18]

Petitioners claim that they are entitled to judicial review of the denial of a waiver application. However, we find no basis for a right of appeal under the Pennsylvania Constitution in this circumstance. Article V, Section 9 states:

> There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or **from an administrative agency to a court of record or to an appellate court**, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.

Pa. Const. art. V, § 9 (emphasis added). Attached to the Supplemental Application for Relief by Petitioner Kathy Gregory is a letter, on the Governor's letterhead and signed by both the Governor and Secretary Levine, granting a waiver request by another real estate

---

[18] Our conclusion that the summary procedure for review of written requests for waiver is constitutionally adequate is not a suggestion that the procedure is not without flaws. Much of the Petitioners' written submissions to this Court reflect a frustration with the lack of transparency with the procedure. For example, why are some waivers granted and others denied? While, as described, the criteria for consideration of a re-classification are set forth in communications from the Governor, businesses that have been denied a waiver receive a form letter advising of such determination. The lack of transparency in this process, while explainable because of time constraints, has caused a level of discontent above that of owning a shuttered business. However, a lack of transparency, while perhaps a sign of lack of good government practices, does not constitute a violation of procedural due process.

brokerage company. Supplemental Application, ¶ 15 (Exhibit A). The letter was attached to the Supplemental Application to demonstrate that "[b]y the approval of this waiver, the Governor has determined that real estate services are life-sustaining." *Id.*, ¶ 16. While it is clear that specific requests are reviewed by employees of the DCED, Respondents' Answer at 24, the decision to grant the waiver was that of Governor Wolf and Secretary Levine and was not an administrative adjudication of the DCED.[19] The grant letter does not even reference the DCED's participation in the review process. Neither the Governor nor the Secretary is an "administrative agency." Because Article V, Section 9 does not confer a right of appeal from an executive decision of the Governor or the Secretary, no right of appeal lies in this instance.

### 4. Equal Protection

Petitioners contend that the Executive Order violates the equal protection clauses of the United States and Pennsylvania Constitutions. U.S. Const. amend. XIV; Pa. Const. art. I, § 26. In *Commonwealth v. Bullock*, 913 A.2d 207 (Pa. 2006), this Court held that "[w]hile the Equal Protection Clause assures that all similarly situated persons are treated alike, it does not obligate the government to treat all persons identically." *Id.* at 215. Petitioners contend that the Executive Order prevents DeVito Committee from using its principle place of business for operations in running Mr. DeVito's political campaign. Petitioners' Brief at 57. In contrast, they argue that elected officials, including the state

---

[19] The DCED has adjudicatory bodies that make administrative determinations, including for example the State Board of Property. The work of reviewing and deciding waiver requests is, however, not the work of an adjudicatory body with the DCED, but rather that of about fifty DCED employees familiar with the NAICS code. Madasyn Lee, "Nearly 10K Pennsylvania businesses apply for closure waivers," TribLive (Mar. 22, 2020) https://triblive.com/local/regional/nearly-10k-pennsylvania-businesses-apply-for-closure-waivers/ .

representative against whom Mr. Devito is running, are permitted to continue to use their offices, staff, equipment and supplies at their discretion. *Id.* Mr. Devito further contends that he is similarly situated to both his political opponent and social advocacy organizations in that they all advocate for social and political causes, but elected officials and social advocacy groups are identified in the Executive Order as life-sustaining and thus are not barred from their physical place of operations. *Id.*

Campaign offices and legislative offices are not similarly situated. When legislators, like Mr. DeVito's political opponent, use their district offices, they do so as government officials, not as candidates. Indeed, it is a crime for public officials to use public resources - including taxpayer funded offices, staff, or equipment—to run for reelection. See e.g., 18 Pa.C.S. § 3926 (theft of services); 18 Pa.C.S. § 4113 (misapplication of government property); 65 Pa.C.S. § 1103 (conflict of interest). As the Respondents correctly note, while the legislative office of Mr. DeVito's opponent remains open, albeit without public visitations, its operations are limited to serving the public during this pandemic and to voting remotely on legislation. Respondents' Brief at 57. But all **candidates**' physical offices, whether incumbent or challenger, must be closed. *Id.* The Executive Order thus does not advantage or disadvantage any candidate or campaign committee. *Id.*

Furthermore, DeVito Committee is not similarly situated to social advocacy groups. Social advocacy groups advocate for vulnerable individuals during this time of disaster. While Mr. DeVito personally may similarly advocate for worthy social and political causes, there is no indication that DeVito Committee does so nor is it the primary focus of the operation. To the contrary, in the Emergency Application, Petitioners alleged that DeVito

Committee's political candidate committee was formed to operate and administer a political campaign, and to that end, its members meet with volunteers, supporters, potential media, vendors and other persons or parties instrumental to conducting a political campaign, as well as conducting direct mail activities, press conferences and other promotions. Emergency Application ¶¶ 61, 63.

Finally, Petitioners indicate that Blueberry Hill is similarly situated to municipal golf courses, but that the Executive Order has closed public, but not municipal, golf courses. Petitioners' Brief at 55. As Respondents properly indicate, however, the list of life-sustaining businesses makes no distinction between public and municipal golf courses. To the extent that municipal golf courses remained open because they were subject to local control, i.e., municipal governments, Respondent cites to a growing list of municipal golf courses that are closed by reason of efforts to mitigate COVID-19. *Id.* at 45.

For these reasons, the Executive Order does not violate constitutional equal protection principles.

### 5. First Amendment Rights

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. Amend. I. Further, Article I, Sections 7 and 20 of the Pennsylvania Constitution provide, in pertinent part, that "every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty" and "citizens have a right in a peaceable manner to assemble together for their common good…" Pa. Const. Art. 1, §§ 7, 20. DeVito Committee argues the Executive Order

impinges upon these constitutional guarantees, as it interferes with the right to peacefully assemble, as it closed a "place of physical operations" they wish to use to "hold meetings and to engage in speech and advocacy." Petitioners' Brief at 58.

Constitutional rights to free speech and assembly, however, are not absolute, and states may place content neutral time, place, and manner regulations on speech and assembly "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006) (the right of assembly and expressive association are "'no more absolute than the right of free speech or any other right; consequently there may be countervailing principles that prevail over the right of association'") (quoting *Walker v. City of Kansas City*, 911 F.2d 80, 89 n. 11 (8th Cir. 1990)); *Duquesne v. Fincke*, 112 A. 130, 132 (Pa. 1920) (Article 20 does not grant "the right to assemble with others, and to speak wherever he and they choose to go"). "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

There is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest. As to whether the Executive Order unreasonably limits alternative avenues of communication, it does not.

The Executive Order does not place a restriction on supporters of DeVito Committee to assemble with each other and speak to each other, it only forecloses doing so in the physical campaign office. It does not in any respect limit the ability to speak or

assemble, however, as it does not in any respect prohibit operations by telephone, video-conferencing, or on-line through websites and otherwise. In this era, cyberspace in general and social media in particular have become the lifeblood for the exercise of First Amendment rights. *See Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017).

Finally, "the principle inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. Respondents argue that the Executive Order is content neutral. It does not regulate speech at all, let alone based on content. It applies to a large number of non-life sustaining businesses regardless of message, whether "campaign office, rock concerts, or haberdasheries." Respondents' Brief at 41. We agree. The Executive Order is tailored to meet the exigencies of COVID-19 restricting in-person gatherings to promote social distancing. It does not otherwise prohibit alternative means of communication or virtual gathering.

Accordingly, we conclude that the Executive Order does not violate the First Amendment to the United States Constitution or Article I, Sections 7 and 20 of the Pennsylvania Constitution.

## V. The Supplemental Applications of Gregory and Blueberry Hill

Subsequent to the filing of the Emergency Application, Petitioners Gregory and Blueberry Hill filed supplemental applications for relief, requesting that this Court enter orders directing the Governor to move them from the non-life-sustaining list to the life-sustaining list. It is not for this Court, but rather for the Governor pursuant to the powers conferred upon him by the Emergency Code, to make determinations as to what businesses, or types of businesses, are properly placed in either category. This Court's

grant of King's Bench jurisdiction here was expressly limited to deciding the statutory and constitutional challenges to the Executive Order presented in Petitioners' Emergency Application. *See* supra at 15. As the Supplemental Applications lack any jurisdictional basis, they are dismissed.

## VI. Disposition

We grant the request to exercise our King's Bench jurisdiction. For the reasons set forth in this opinion, we conclude that Respondents had the statutory authority to issue the Executive Order and that Petitioners have not established any basis for relief based upon their constitutional challenges. The claim for relief requested in the Application, to vacate or strike the Executive Order, is therefore denied.

Justices Baer, Todd and Wecht join the opinion.

Chief Justice Saylor files a concurring and dissenting opinion in which Justices Dougherty and Mundy join.